UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHEETAH MINER USA INC.,

    Plaintiff,

v.

19200 GLENDALE, LLC,

    Defendant.

_____/

Civil Case No. 23-10812
Honorable Linda V. Parker

### OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 2]

This is a diversity action arising from Defendant's alleged breach of contract and constructive eviction of Plaintiff from the leased property. Plaintiff requires "significant electrical capacity" in order to run its Bitcoin mining business which it asserts that Defendant had the power to cut-off amounting to a constructive eviction. In the Complaint, Plaintiff alleges the following claims against Defendant: constructive eviction in violation of Michigan's Anti-Lockout Statute, Mich. Comp. Laws 600.2918(2) (Count I); and breach of contract under Michigan law (Count II). The matter is presently before the Court on Plaintiff's "Emergency Motion for Immediate Injunction" requiring Defendant to "immediately restore the same level of electrical service as existed when Plaintiff took possession of the

premises." (ECF No. 2 at Pg ID 92.) On April 26, 2023, the Court held a hearing on the motion. For the reasons that follow, the Court is denying Plaintiff's motion.

## I. Background

Plaintiff Cheetah Miner USA Inc. ("Plaintiff") is a Bitcoin mining business,[1] which requires "significant electrical capacity, as well as sophisticated hardware and software" to operate its business. (ECF No. 1 ¶ 14, Pg ID 3.) Effective April 1, 2022, Plaintiff signed a lease agreement to occupy a 23,150 square foot space in an industrial building (the "property") owned by Defendant 1500 Glendale, LLC ("Defendant"), located in Detroit, MI. On or about April 7, 2022, Plaintiff entered into a separate contract with DTE Energy for the electrical capacity required to run

---

[1] Plaintiff's website describes Bitcoin mining:

> Cryptomining is the process of validating a cryptocurrency transaction. Cryptocurrencies like Bitcoin use distributed public ledgers to record all financial transactions. Each transaction is linked to the previous and subsequent transactions, which creates a chain of time-stamped records called a blockchain.
>
> Miners run mining "rigs," computer equipment that generates new blocks of transactions to be added to the cryptocurrency blockchain. In return, miners are rewarded by earning newly minted coins and transaction fees.

See Cheetah Miner USA, *What is Bitcoin Mining*, https://cheetahminerusa.com/ [https://perma.cc/T4LX-LHEP].

2

its business. According to Plaintiff, when it took possession of the property, "it had sufficient electrical capacity for Plaintiff's needs." (*Id.* ¶ 20, Pg ID 4.)

According to Plaintiff, the parties began to have "tension" and Plaintiff believes that "Defendant sought to begin and/or expand its own business operations at the building and needed the electrical capacity availed to Plaintiff," and at an unspecified time, Plaintiff alleges that Defendant began to "repeatedly threaten eviction." (*Id.* ¶¶ 24-25.) On January 23, 2023, Plaintiff provided Defendant with a lease termination agreement, which Defendant did not sign. On February 7, 2023, Plaintiff alleges that "Defendant cut off Plaintiff's electrical service by moving the DTE account to Defendant's name." (ECF No 1 at Pg ID 87.) When Plaintiff inquired about the change to the electrical service, DTE stated that February 7 was the "stop service date." (ECF No. 1-5 at Pg ID 66.) Plaintiff requested documents related to the "stop service" for which DTE responded that it "cannot send . . . documents submitted by another customer." *Id.*

On February 7, 15, and 27, Plaintiff sent e-mails to Defendant regarding the status of the countersigned lease termination agreement and requested that Defendant restore electrical service to the location, but according to Plaintiff, Defendant refused.[2] Plaintiff continued to receive bills from DTE for "minimal

---

[2] Notably, Plaintiff asserts that Defendant "refused" to restore service, yet also concedes that Defendant never responded to the e-mail requests. A non-response does not equate to a refusal.

3

usage" through March 13, 2023 and alleges that "there is no indication that it was DTE that terminated Plaintiff's account, nor would there be any reason for DTE to do so since payments were current." (ECF No. 1 ¶ ¶ 35-36 at Pg ID 6.)  On April 10, 2023, Plaintiff filed the current lawsuit requesting damages for lost profits and injunctive relief pursuant to Mich. Comp. Laws 600.2918(6).

## II.  Standard for Injunctive Relief

Federal Rule of Civil Procedure 65 grants district courts the power to issue an *ex parte* temporary restraining order to maintain the status quo until the court has the opportunity to hold a hearing and decide whether a preliminary injunction should issue.  *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993) (citing *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974)).  "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  The court considers the following factors when deciding whether to issue injunctive relief: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction."  *Id.* (citations omitted).

"These factors are not prerequisites, but are factors that are to be balanced against each other." *Id*. (citations omitted). Although the court must balance and weigh the relevant preliminary injunction considerations, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 223 F.3d 620, 625 (6th Cir. 2000). Thus, the court is not required to make specific findings concerning each of the four factors if fewer factors are dispositive. *In re DeLoreon Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

### III. Analysis

#### A. Likelihood that Plaintiff will Prevail on the Merits

1. *Violation of Mich. Comp. Laws § 600.2918(2)*

Plaintiff maintains that by changing the electrical service for the leased area, Defendant violated Michigan law. The Michigan Anti-lockout statue provides, in relevant part, the following:

> 2) Any tenant in possession of premises whose possessory interest has been unlawfully interfered with by the owner is entitled to recover the amount of his or her actual damages or $200.00, whichever is greater, for each occurrence and, if possession has been lost, to recover possession. Subject to subsection (3), unlawful interference with a possessory interest includes 1 or more of the following:
> …
> (f) Causing, by action or omission, the termination or interruption of a service procured by the tenant or that the landlord is under an existing duty to furnish, which service is so essential that its termination or interruption would

5

>constitute constructive eviction, including heat, running water, hot water, electric, or gas service.

Mich. Comp. Laws § 600.2918(2)(f); *Nelson v. Grays*, 531 N.W.2d 826, 828 (Mich. Ct. App. 1995). The statute "virtually eliminates the self-help remedy in Michigan in favor of judicial process to remove a tenant wrongfully in possession." *Mills v. Cnty. of Lapeer*, 498 F. App'x 507, 510 (6th Cir. 2012) (citing *Deroshia v. Union Terminal Piers*, 391 N.W.2d 458, 460 (Mich. Ct. App. 1986)).

"A constructive eviction occurs when there is a disturbance of the tenant's possession by the landlord, the premises are rendered unfit for occupancy for the purposes for which they were demised, or the landlord deprives the tenant of the beneficial use and enjoyment of the property, in whole or part." *Lewis v. Cross*, No. 276062, 2008 WL 2744378, at *1 (Mich. Ct. App. July 15, 2008) (citations omitted). Moreover, a "[c]onstructive eviction can also be found where a landlord fails to supply essential services." *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 279 (Mich. 2003) (citing *Everson v. Albert*, 246 N.W. 88 (Mich. 1933). "To establish a constructive eviction, a tenant must *relinquish the premises* within a reasonable time after the act or condition arises." *Wickins v. Lyon Marine, Ltd.*, No. 176355, 1997 WL 33353736, at *1 (Mich. Ct. App. Apr. 1, 1997) (citations omitted) (emphasis added).

Plaintiff maintains that the Court should issue an injunction because Defendant constructively evicted Plaintiff when Defendant allegedly had the

6

electrical service shut off, which prevents Plaintiff from operating its Bitcoin mining business.  (ECF No. 2 at Pg ID 91.)  However, Defendant maintains that Plaintiff cannot establish its claim of a constructive eviction because Plaintiff did not vacate the premises as required under common law. (ECF No. 6 at Pg ID 196.) Defendant's argument is most persuasive.  Michigan law is clear: an aggrieved party must vacate the premises within a reasonable amount of time to allege a constructive eviction.  *See Wickins*, 1997 WL 33353736, at *1;  *Briarwood v. Faber's Fabrics, Inc.*, 415 N.W.2d 310, 313 n.2 (Mich. Ct. App. 1987) (noting that under the definition of constructive eviction, the landlord's actions must "caus[e] the tenant to abandon the premises.").

    Here, Plaintiff did not allege to have been forced to vacate the property but that the disruption in electrical service prevented Plaintiff from "operating its Bitcoin mining operation."  (ECF No. 2 at Pg ID 91.)  To the contrary, Plaintiff concedes that it currently "is a tenant at an industrial building in Detroit," ECF No. 2 at Pg ID 87, and ""remains in legal possession of the premises," ECF No. 8 at Pg ID 260.  Although section 2 of the Anti-Lockout Statute "defines the elements of unlawful interference with a possessory interference," *see Belle Isle Grill Corp.*, 666 N.W.2d at 279, which includes a landlord's failure to supply power to a tenant, vacating the premises is still a requirement in order to constitute a constructive eviction.  Because Plaintiff is still in possession of the property, this claim may

7

likely be waived. *See Wickins*, 1997 WL 33353736, at *1 ("A tenant may waive a constructive eviction claim if he continues to occupy the premises, unless he does so at the request of the landlord or in reliance upon the landlord's promises.") Although it is reasonable for the Court to view Plaintiff's expectation to receive a countersigned Lease Termination Agreement as a "reliance" on Defendant's promise, *see id.*, once Plaintiff did not hear back from Defendant after over a month, that reliance likely lost its reasonableness.

2.  *Breach of Lease (Contract)*

Under Michigan Law, the party asserting breach of contract must demonstrate, by a preponderance of the evidence, that: (1) there was a contract between the parties, (2) a breach of its terms by the other party, and (3) damages resulting to the party claiming the breach. *See Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). "A lease gives the tenant the possession of the property leased and the exclusive use or occupation of it for all purposes not prohibited by the terms of the lease." *Caro Trans Opportunities LLC v. Mobile Med. Response, Inc.*, No. 337074, 2018 WL 2990796, at *3 (Mich. Ct. App. June 14, 2018) (quoting *De Bruyn Produce Co. v. Romero,* 508 N.W.2d 150, 155 (Mich. Ct. App. 1993). Michigan courts "examine the language of the contract [i.e. lease agreement] and accord the words their ordinary and plain meanings, if such meanings are apparent. If the contractual language is unambiguous, courts must

8

interpret and enforce the contract as written." *Redmann v. Leete*, No. 284381, 2009 WL 2351482, at *2 (Mich. Ct. App. July 30, 2009) (quotation omitted) (alteration in original).

Plaintiff maintains that "Defendant modified the Premises although not permitted to do so under Section 2(A) of the Lease," and as such, its "actions constitute a breach of the Lease." (ECF No. 1 ¶ 45, Pg ID 7.)  In support of this argument, plaintiff states that "in violation of the Lease, Defendant materially changed the electrical capacity available for Plaintiff's use as of February 7." (ECF No. 2 at Pg ID 89.).  However, Plaintiff fails to direct the Court to the relevant portion of Section 2(A) of the Lease that Defendant allegedly breached. Because the burden of proof lies with the Plaintiff to prove the existence of a breach, *see Miller-Davis Co.*, 848 N.W.2d at 104, the Court will not speculate to, or proffer any arguments on Plaintiff's behalf.

In response, relying on Michigan law, Defendant maintains that Plaintiff cannot prevail on the breach of contract claim because Plaintiff "first materially breached" the lease agreement due to the following: (1) failing to pay rent as required; (2) failing to install an electrical sub-meter, and (3) failing to pay amounts owed for utilities. (ECF No. 6 at Pg ID 195.)  "The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Stanwood*

9

*Motor Sports Acquisition, L.L.C. v. Arnold*, No. 313994, 2014 WL 1515373, at *3 (Mich. Ct. App. Apr. 17, 2014). For this rule to apply, "the initial breach must be substantial." *Chalk Supply LLC v. Ribbe Real Est. LLC*, No. 345805, 2020 WL 39991, at *4 (Mich. Ct. App. Jan. 2, 2020). "To determine whether a substantial breach occurred, a trial court considers 'whether the nonbreaching party obtained the benefit which he or she reasonably expected to receive.' " *Id.* (quoting *Able Demolition, Inc. v. Pontiac*, 739 N.W.2d 696, 701 (Mich. Ct. App. 2007)). In support of Defendant's claims that Plaintiff breached first, Joseph Caradonna, the manager of Defendant, filed an affidavit stating that:

> Cheetah Miner failed to pay rent, requiring us to have to send written payment demand letters in the first month of tenancy. Going forward, Cheetah Miner continued to fail to pay rent when and as due, failed to pay utilities, failed to install a sub-meter for electricity as required, failed to make payments required for common areas and maintenance, failed to provide proof of insurance, and more.

(Caradonna Aff., Ex. A, ECF No. 6-2 ¶ 7, Pg ID 200.)

Regarding the alleged failure to pay rent, Plaintiff disputes this claim, *see* ECF No. 8 at Pg ID 261, and at the motion hearing, Plaintiff argued that it did in fact pay rent, albeit untimely. However, neither party produced tangible evidence on this matter. Next, in support of Plaintiff's claim that it paid the electric bill, Plaintiff produced a DTE bill in which there was a large credit to its account as

well as an unpaid balance of $20,215.26 as of January 31, 2023.[3] (Ex. K., ECF No. 8-3 at Pg ID 278.) During the motion hearing, Plaintiff also raised the point that if DTE did in fact shut the power off based on non-payment, Plaintiff would have received a shut-off notice, which it did not. Plaintiff further explained that the power was not "shut-off" but was re-routed to a different section of the property by a switch in the building, to which only Defendant had access. At this point in the litigation, it is unclear as to the true nature of the electricity being "shut off": whether it was due to non-payment of the remaining balance or if Defendant intentionally re-routed power. Additional discovery would be necessary for the Court to reach a conclusion on this matter.

 Further, Plaintiff does not address Defendant's claim regarding the sub-meter and failure to submit proof of insurance but to argue that they are "contractual terms that have no bearing here." (ECF No. 8 at Pg ID 264 n.1.) Plaintiff is incorrect as they go directly to the likelihood of success on the merits based on Defendant's defense. Because the facts and evidence are still unclear at this point in the litigation, this factor is neutral as to whether to grant an injunction.

---

[3] It is also noteworthy that according to Steve Harris, the former Principal Account Manager for DTE Energy, Plaintiff "owed substantial amounts to DTE in unpaid utility bills" at least around December 2022 when he retired. (Harris Decl., Ex B, ECF No. 6-3 ¶ 7, Pg ID 206.)

## B. Irreparable Harm

"An injury is irreparable if the harm is difficult to calculate." *RECO Equip., Inc. v. Jeffrey S. Wilson*, No. 20-4312, 2021 WL 5013816, at *4 (6th Cir. Oct. 28, 2021). A party's harm is "irreparable" when it cannot be adequately compensated by money damages. *Eberspaecher N. Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592, 603 (E.D. Mich. 2008). "For an injury to constitute irreparable harm, it must also 'be certain, great, and actual.'" *Cooper-Standard Auto. Inc. v. Daikin Am., Inc.*, 568 F. Supp. 3d 846, 848 (E.D. Mich. 2021) (quoting *Lucero v. Detroit Public Schools*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001). "[L]oss of customer goodwill" and damage to "competitive position" are harms that are difficult to calculate. *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001); *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2016).

In the Complaint, plaintiff only alleges economic damages due to the disruption in electrical service, specifically those of lost profits. (ECF No. 1 ¶¶ 41, 49, Pg ID 6-7.) "Because lost profits and economic harm can be calculated and remedied through compensatory damages, they are generally not sufficient to obtain injunctive relief." *Northwood, Inc. v. Clinical Wound Sols., LLC*, No. 20-13356, 2021 WL 1345574, at *4 (E.D. Mich. Apr. 12, 2021); *see also Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003) ("[B]ecause any damages would be economic in nature and fully compensable monetarily, we find no

potential for irreparable harm."); *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 599 (6th Cir. 2014) ("[M]ere loss of profits generally will not qualify as irreparable harm."). Plaintiff now maintains that the electricity being shut off amounts to a "[l]oss of the use of a property interest in a tenancy . . . that cannot be remedied with monetary damages." (ECF No. 8 at Pg ID 264.) Specifically, Plaintiff asserts that "the nature of injury, including reputational injury caused by being put unceremoniously out of business, is irreparable." (*Id.*) Although Plaintiff cites to a case in this District for the proposition that "a risk to the plaintiff's reputation also threatens irreparable harm," *see Salita Promotions Corp. v. Ergashev*, 500 F. Supp. 3d 648, 654 (E.D. Mich. 2020) (Michelson, J.), it fails to state exactly what the harm to its reputational would be in the event that an injunction is not granted. The Court does not see a cognizable risk to Plaintiff's reputation. As such, this factor weighs against granting an injunction.

### C. Balancing of Harms and Public Interest

Neither party presents any cognizable risks of harm pending an injunction. Parties also do not make any arguments regarding the public interest. As such, these factors are neutral to both parties.

## IV. Conclusion

Because Plaintiff failed to demonstrate that the "extraordinary remedy" of a preliminary injunction is necessary, *see Overstreet*, 305 F.3d at 573, for the above reasons, the Court denies Plaintiff's request.

Accordingly,

**IT IS ORDERED** that Plaintiff's "Emergency Motion for Immediate Injunction" (ECF No. 2) is **DENIED.**

s/ Linda V. Parker<br>
LINDA V. PARKER<br>
U.S. DISTRICT JUDGE

Dated: May 3, 2023