-UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHEETAH MINER USA INC.,

      Plaintiff,

v.

19200 GLENDALE, LLC, *et al*.,

      Defendants.

_____/

Case No. 23-10812
Hon. Linda V. Parker

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 63) AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 60)

This matter is before the Court on Defendants 19200 Glendale, LLC

("19200 Glendale") and Joseph Caradonna's motion for summary judgment and

Plaintiff Cheetah Miner USA, Inc.'s ("Cheetah Miner") motion for partial

summary judgment.  (ECF Nos. 60, 63.)  The motions are fully briefed.[1]  (ECF

Nos. 62, 64-66.)  For the following reasons, Defendants' motion for summary

judgment (ECF No. 60) is **GRANTED IN PART AND DENIED IN PART** and

Plaintiff's motion for partial summary judgment (ECF No. 63) is likewise

**GRANTED IN PART AND DENIED IN PART**. It is further ordered that both

---

[1] The Court finds that oral argument will not aid in its disposition of the motions; therefore, it is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

motions are **HELD IN ABEYANCE** as to Count I of the complaint, as discussed below.

## I.    BACKGROUND

19200 Glendale owns an approximately 200,000 square foot industrial building located at 19200 Glendale in the city of Detroit, Michigan (the "Building"). Cheetah Miner is a manufacturer of Bitcoin mining machines based in China. The parties executed a written lease agreement effective April 1, 2022 ("Lease Agreement" or "Lease") to occupy a 23,150 square foot space in the 19200 Glendale building (the "Property"). The Lease provides that Cheetah Miner was to use the space "for crypto currency mining equipment for the verification and production of Bitcoin and other lawful purposes directly related to verification and production of Bitcoin." (ECF No. 60-3, PageID.2208.) The Lease has a term of sixty (60) months and, by its terms, will expire in the spring of 2027. (ECF No. 60-3, PageID.2208.)

In the First Amended Complaint, Cheetah Miner brings the following claims against 19200 Glendale: unlawful interference with a tenant's possessory interest in violation of Michigan's Anti-Lockout Statute, Mich. Comp. Laws § 600.2918(2) (Count I); and breach of contract under Michigan law (Count II). (ECF No. 49.) 19200 Glendale brings the following claims against Cheetah Miner: breach of contract under Michigan law (Count I); and declaratory relief seeking an order

declaring Cheetah Miner has breached the Lease and is in default (Count II).  (ECF No. 56.)

Cheetah Miner argues that the Lease prohibits 19200 Glendale from altering the Property during its tenancy, namely, by altering the power supply.  In support of this argument, Cheetah Miner cites Section 2(A) of the Lease which reads in relevant part as follows:

> A.    <u>Lease of the Premises</u>. For and in consideration of the rent hereinafter reserved and the mutual covenants hereinafter contained, and upon all the terms and provisions of this Lease, Landlord does hereby lease and demise unto Tenant, and Tenant does hereby lease and accept from Landlord the Premises. ***Landlord has made no representation or warranty as to the suitability of the Premises or the Project for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises or Project are suitable for Tenant's intended purposes***. TENANT ACKNOWLEDGES THAT (1) AS OF THE DATE IT ACCEPTS POSSESSION OF THE PREMISES IT SHALL HAVE INSPECTED AND ACCEPTED THE DEMISED PREMISES IN ***AN "AS IS, WHERE IS" CONDITION***, (2) THE BUILDINGS AND IMPROVEMENTS COMPRISING THE SAME ARE SUITABLE FOR THE PURPOSE FOR WHICH THE PREMISES ARE LEASED AND LANDLORD HAS MADE NO WARRANTY, REPRESENTATION, COVENANT, OR AGREEMENT WITH RESPECT TO THE MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PREMISES, (3) AS OF THE DATE TENANT ACCEPTS POSSESSION, THE PREMISES ARE IN GOOD AND SATISFACTORY CONDITION, (4) NO REPRESENTATIONS AS TO THE REPAIR OF THE PREMISES, NOR PROMISES TO ALTER, REMODEL OR IMPROVE THE PREMISES HAVE BEEN MADE BY LANDLORD EXCEPT AS EXPRESSLY SET FORTH HEREIN, AND (5) ***THERE ARE NO REPRESENTATIONS OR WARRANTIES, EXPRESSED, IMPLIED OR STATUTORY, EXCEPT AS EXPRESSLY SET FORTH HEREIN.***

****

3

> ***Landlord reserves the right to install, maintain, use, repair and replace pipes, ducts, conduits, wires and structural elements leading through the Premises and serving other parts of the Project***. Landlord hereby reserves the right at any time, and from time to time, to ***make alterations or additions*** to, and to build additional stories on the Building and to build adjoining the same.

(ECF No. 60-3, PageID.2209 (emphasis added).)

19200 Glendale argues that this section supports the proposition that Cheetah Miner was responsible for obtaining a separate source of electricity through DTE, and that use of the Building's general electricity was only a temporary accommodation.  (ECF No. 62-4, PageID.2412.)  The other portion of the Lease relevant to utilities is Section 10(d), which states:

> <u>Interruptions</u>. Landlord shall not be liable for, and Tenant shall not be entitled to, ***any damages***, abatement or reduction of Rent, or other liability by reason of ***any failure to furnish any services or utilities*** described herein for any reason, including, without limitation, when caused by accident, breakage, repairs, alterations or other improvements to the Project, strikes, lockouts or other labor disturbances or labor disputes of any character, governmental regulation, moratorium or other governmental action, inability to obtain electricity, water or fuel, or any other cause beyond Landlord's control.

(ECF No. 60-3, PageID.2217 (emphasis added).)  The Lease includes an integration clause, and the parties have not contested its validity.  (ECF No. 60-3, PageID.2227.)  Cheetah Miner has provided a Letter of Intent signed by Caradonna which states "Tenant plans to add additional machines when DTE installs a substation for additional power."  (ECF No. 62-3, PageID.2405.)

4

## A. Payment of Rent, Operating Expenses, and Utilities

According to Cheetah Miner's corporate representative, Hassan Miah, rental payments prior to termination discussions were made "within the legal boundaries of the lease, which may or may not have been the exact date the rent was due." (ECF No. 60-2, PageID.2164.)  Rent payments stopped when termination discussions began and have not recommenced since then.  (*Id.*)  Laura Basilisco, a controller of 19200 Glendale, avers that Cheetah Miner owes $173,489.20 in unpaid rent, as of September 2024. (ECF No. 60-10.)  The unpaid rent is comprised of monthly rent from December 2022 until September 2024.  (*Id.*)

Basilisco also avers that Cheetah Miner owes  $130,198.55 in common area maintenance charges under the Lease, as of September 2024.  (*Id.*)  The common area maintenance charges are from April 2022 until September 2024.  (*Id.*)  In terms of common areas expenses, the Lease provides that:

**Operating Expenses and Taxes**.

(a) Commencing on the Commencement Date, Tenant agrees to pay as Additional Rent (as defined in Section 6(f) below) Tenant's Proportionate Share all Operating Expenses and Taxes (as such terms are hereinafter defined) for the Project. If a date on which Additional Rent obligation commences shall fall on a day other than the first day of the calendar year, and/or if the Expiration Date shall fall on a day other than the last day of the calendar year, Operating Expenses and Taxes for such calendar year shall be apportioned prorata. "Tenant's Proportionate Share" shall mean a percentage which shall be calculated by dividing the square footage of the Premises by the number of square feet of the Building. The Tenant's Proportionate Share is currently 12.2%.

5

(ECF No. 60-3, PageID.2212.)[2]

An act of default would occur under the Lease "if Tenant fails to perform or observe any other term of this Lease and such failure shall continue for more than ten (10) days after Landlord gives Tenant written notice of such failure." (ECF No. 60-3, PageID.2221.) There is no specific evidence in the record that 19200 Glendale provided written notice to Cheetah Miner of any of the alleged acts of default or that any of the violations continued after the expiration of a cure period. However, Caradonna testifies that Cheetah Miner was informed that it was in violation of the Lease and was served notices of default, although it is unclear which violations these notices related to or when they were served. (ECF No. 60-11, PageID.2284, 2290-2291.)

As of January 31, 2023, 19200 Glendale argues that Cheetah Miner owes DTE the amount of $13,407.54 for electricity used at the Property. (ECF No. 60, PageID.2124.) In support of this assertion, it identifies a DTE invoice with a due date of July 28, 2023 for $168,923.35 in electricity used by Cheetah Miner. (ECF No. 60-9, PageID.2269.) The bill includes a line item for "Previous Balance as of 01/24/2023" which is identified as $34,845.12. (*Id.* at PageID.2271.) It has also

---

[2] Section 6(b) of the Lease defines "Operating Expenses" as all costs incurred "in policing, protecting, maintaining and repairing (but not replacement of) the lighting, heating, insurance, of the (i) Building, (ii) Common Areas and (iii) all other areas, facilities and buildings used in the maintenance and operation of the Project[.]" (ECF No. 60-3, PageID.2212.)

provided a DTE invoice with a due date of January 20, 2023, with a total of $13,407.54 due.  (ECF No. 60-7, PageID.2259.)  This bill includes a line item for "Previous Balance as of 11/16/2022" which is identified as $107,564.25, to which a rate change credit was applied.  (*Id.* at PageID.2261.)  Miah testifies that the outstanding balance with DTE reflects a rate change due to fuel tariffs that were applied retroactively and that this amount remains unpaid.  (ECF No. 60-2, PageID.2186, 2188.)  DTE's former Principal Account Manager, Steven Harris, avers that at the time of his retirement in December 2022, Cheetah Miner owed substantial amounts to DTE in unpaid utility bills.  (ECF No. 60-4, PageID.2248.)

In contrast, Hassan Miah testifies that Cheetah Miner was current on its DTE electrical bill as of February 7, 2023.  (ECF No. 60-2, PageID.2186.)  Cheetah Miner also submitted emails showing that it disputed certain adjustments made due to fuel tariffs in August 2023, which factored into the amount due cited by 19200 Glendale.  (ECF No. 65-8.)

It is undisputed that Cheetah Miner was obligated to obtain insurance for the Property under the Lease and that failure to obtain insurance was considered an act of default if the failure should "continue for more than three (3) days after Landlord gives Tenant notice of such failure."  (ECF No. 60-3, PageID.2214-2215; ECF No. 62-2, PageID.2371-2372, PageID.2378.-2379.)  Cheetah Miner has provided a certificate of insurance with insurance "policy changes" effective

7

beginning May 20, 2022.  (ECF No. 64-2, PageID.2627.)  However, it is unclear

that Cheetah Miner had insurance for the Property prior to May 20, 2022.  (ECF

No. 65, PageID.2651.)  Likewise, there is evidence that Cheetah Miner was given

notice and then failed to cure the defect within the applicable period. (*See*

*generally* ECF No. 60-11, PageID.2284, 2290-2291.)  Cheetah Miner argues that it

obtained insurance within the applicable period.  (ECF No. 66, PageID.2811.)

Finally, it is undisputed that a fire suppression system was never installed, which

19200 Glendale argues was required by the Lease.  (ECF No. 60-3, PageID.2216;

ECF No. 60-2, PageID.2170.)

### B. Separate Meter

19200 Glendale argues that under the Lease, Cheetah Miner was obligated to

install a separate meter and submeter.[3]  As grounds for this argument, 19200

Glendale points to Section 9 of the Lease which reads as follows:

> **<u>Utilities/Telecommunications</u>**. Notwithstanding anything contained herein
> to the contrary, Tenant shall be solely responsible for all utility costs,

---

[3] Some definitions are required, as the parties sometimes conflate and confuse terms. (*See* ECF No. 65, PageID.2641 (citing Section (9) requiring a ***sub-meter*** for the proposition that the Lease required the installation of a ***substation***).)  An electrical meter is used to measure the use of electricity by all units within a building or property. *See generally* Washington State University Energy Program, *The Short Guide to Energy Submetering*, (April, 2019) https://www.energy.wsu.edu/Portals/0/Documents/A_Short_Guide_to_Submetering-April2019-FINAL.pdf [https://perma.cc/4K9X-6Q8Q]. A submeter is used to measure electricity to each individual unit within a building. *Id*. Meters are measurement tools and do not increase the total electricity available to a building. *See generally* id. To increase the total electrical availability to a property, a substation, generator, or other alternative source of power needs to be installed. *See generally* Occupational Health and Safety Administration, *Substations*, Illustrated Glossary, https://www.osha.gov/etools/electric-power/illustrated-glossary/sub-station#accordion-72238-collapse5 [https://perma.cc/HC82-4GR4].

specifically electrical, used for Tenant's Use and for the Premises, without regard to proportionate share.

Commencing on the date Landlord delivers the Premises to Tenant for the commencement of the Tenant Improvements, Tenant shall promptly pay as billed to Tenant all rents and charges for . . . electricity . . . used or consumed in or servicing the Premises and surcharges related thereto and any maintenance and facility charges in connection with the provisions of such utilities. All utilities with separate meters shall be paid for by Tenant directly to the applicable service provider. ***Tenant shall install a sub-meter to the Premises to track its electrical usage prior to the installation of any separate meter.*** Tenant will be solely responsible for the cost of any separate or sub metering and will be solely responsible for the utility costs attributable to its use.

Tenant's proportionate share of any utilities which are not separately metered shall be billed to Tenant by Landlord (which invoices shall be paid by Tenant to Landlord within 10 days after receipt), subject to equitable adjustment if Tenant or any other tenant's use of its premises is inconsistent with a pro-rata share payment. If Tenant fails to pay any utility bills or charges, Landlord may, at its option and upon reasonable notice to Tenant, pay the same and, in such event, the amount of such payment, together with interest thereon at the Interest Rate from the date of such payment by Landlord will be added to Tenant's next due payment as Additional Rent . . . ***Landlord shall not be liable to Tenant for interruption in or curtailment of any utility service, nor shall any such interruption or curtailment constitute constructive eviction or grounds for rental abatement.***

***Tenant, at its cost and for its own account, shall be solely responsible for obtaining and installing all telecommunications systems***, including voice, video, data, Internet, and any other services provided over wire, fiber optic, microwave, wireless, and any other transmission systems ("Telecommunications Services"), for part or all of Tenant's telecommunications or Use within the Premises.

(ECF No. 60-3, PageID.2214-2215 (emphasis added).)  The Lease also includes a

provision outlining the requirements for tenant improvements:

> **Tenant Improvements/Allowance**. Tenant shall be responsible for and shall perform all work of whatsoever nature necessary for Tenant's initial preparation of the Premises for its business operations, at Tenant's sole cost and expense. All work shown on or contemplated by the Construction Documents is referred to herein as the "**Tenant Improvements**".

(*Id.* at PageID.2211.)

On or about April 7, 2022, Cheetah Miner approached the utility provider, DTE Energy, and requested a load increase for the Property.  (ECF No. 60-5, PageID.2250; ECF No. 60-4.)  DTE informed Cheetah Miner that "[s]ystem work will be required before the load can be added to the customer's location," and estimated the cost of the work required was $44,344.33.  (ECF No. 60-4.)  Cheetah Miner ultimately canceled the load increase request.  (*Id.*)  Cheetah Miner also inquired with DTE about installing a substation at the Property and DTE submitted a proposal containing two options for substations.  (*Id.*)  However, Cheetah Miner did not proceed with either substation option.  (*Id.*; ECF No. 60-2, PageID.2169, 2171.) The preliminary statement from DTE regarding the substation options stated that "2.6 MVA of capacity can be created to temporarily service the customer until an Industrial Substation can be constructed (Phase I)." (ECF No. 60-6, PageID.2253.)

When it moved into the Property, Cheetah Miner worked with Gary Guyette, an electrician, and Casey Hudson, to change the infrastructure of the Building to allow power to be routed to the Property that was sufficient for Bitcoin mining.

(ECF No. 60-2, PageID.2165.)  Casey Hudson is a representative of International Hardcoat ("IHC"), the largest tenant in the 19200 Glendale Building.  (ECF No. 60-11, PageID.2283.)  Caradonna testified that Hudson had no association with 19200 Glendale.  (*Id.*)  However, Miah testified that Caradonna told him that Hudson would "handle everything" for Cheetah Miner.  (ECF No. 60-2, PageID.2167.)  He also testified that Cheetah Miner "took it upon themselves to put the entire building's power in their name" even though every tenant was using the power under that account.  (*Id.* at PageID.2445.)

### C. Current Possession of Property

It is uncontested that Cheetah Miner has not vacated the Property, and 19200 Glendale has not initiated eviction proceedings.  (ECF No. 65-2, PageID.2683; ECF No. 66, PageID.2810; ECF No. 65, PageID.2648.)  Instead, the parties began the negotiation of a Lease Termination Agreement in January 2023.  (ECF No. 60-2, PageID.2181.)  Cheetah Miner states that it has not vacated the Property because it is waiting for a signed lease termination agreement, which the parties were in the process of finalizing in early 2023 but 19200 Glendale ultimately never signed the agreement.  (ECF No. 66, PageID.2809.)  19200 Glendale does not dispute that the parties were in the process of negotiating a lease termination agreement, but points to the fact that such an agreement was never signed and the Lease states that:

(p) No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless in writing and signed by both parties.

(ECF No. 60-3, PageID.2228; *see also* ECF No. 65, PageID.2648.)

Miah testifies that Hudson informed him "early on during the time [Cheetah Miner was] moving in" that "his power needs would increase when he launched IHC operations and therefore [Cheetah Miner's] availability of power could go down." (ECF No. 60-2, PageID.2179.) However, Miah testifies that they "executed the lease based on the power that we would continue -- based on the power we would have available[,]" meaning the Building's general power. (*Id.*) Miah further testifies that to his knowledge, Cheetah Miner was never informed that it would have to provide its own power and that he understood the lease as allowing Cheetah Miner to use the Building's general power. (ECF No. 60-2, PageID.2180.) Hudson testifies that he told Miah that the temporary power accommodation would only last a month. (ECF No. 62-5, PageID.2442.)

Caradonna also testifies that before they entered the Lease, Cheetah Miner was informed that the Building had insufficient power for their purposes and that Cheetah Miner was told that it was responsible for securing additional power. (ECF No. 60-11, PageID.2283, 2285.) Caradonna specifies that,

as is typical in a tenant-landlord situation, until that tenant moves the power into their name as required by the lease and secures power separately metered and meets the obligation of their lease, they may use some of the

> power in the building during setup and move in as they await DTE to
> provide them with their service. But I can't speak to this particular incident.

(ECF No. 60-11, PageID.2286.)  Caradonna also states that Cheetah Miner

changed the power to Cheetah Miner's name without the consent of 19200

Glendale.  (ECF No. 60-11, PageID.2287.)  The power to the bitcoin machines was

turned off on February 7, 2023. (ECF No. 60-2, PageID.2183.)

Caradonna did not personally change the power account back to 19200

Glendale's name.  (ECF No. 60-11, PageID.2292, 2302, 2316.)  Caradonna sent an

email to DTE stating "Please process the Turn On for 19200/19140 Glendale Street

in the name of the 30000 Telegraph Road Building LLC, effective Monday

February 6, 2023." (ECF No. 62-6, PageID.2460.) 19200 Glendale states that it did

not redirect power.  (ECF No. 62-7.)  In emails between Mirana Tan, a

representative of Cheetah Miner, and Caradonna, Tan states that "[Hudson] won't

let him turn on the power to our machines because he hasn't heard from us. The

electricity power is still under our account and we are billed for your electrical use

yet we can't turn on our machines."  (ECF No. 62-23; *see also* ECF No. 62-24,

PageID.2584.)

## II.   STANDARD

The Federal Rules of Civil Procedure provide that the court "shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

13

P. 56(a).  The presence of factual disputes will preclude granting summary judgment only if the disputes are genuine and concern material facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324 (1986).  That is, the non-moving party must provide specific facts to rebut or cast doubt on the moving party's proffered facts.

Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *Celotex Corp.*, 477 U.S. at 322–323.

III.   **ANALYSIS**

**A. Breach of Contract**

To succeeded on a breach of contract action, a plaintiff must show by a preponderance of the evidence that: "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of Am., NA v. First Am. Title Ins. Co.*, 4878 N.W.2d 816, 829 (Mich. 2016). It is uncontested that the Lease constitutes an enforceable contract. The parties' disagreement centers around breach and damages.

In Michigan, determining and enforcing the parties' intent is the primary goal of contract interpretation. *See Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 667 (Mich. Ct. App. 2000). To determine intent, courts read the agreement as a whole, according to its plain and ordinary meaning. *Id.* "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Tr.*, 745 N.W.2d 754, 758 (Mich. 2008). "[I]f two provisions of the same contract irreconcilably conflict with each other, the language of the contract is ambiguous. Further, courts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare an ambiguity." *Klapp v. United Ins. Group Agency*, 663 N.W.2d 447, 453 (Mich. 2003). "Instead, contracts must be 'construed so as to give effect to every word or phrase as far as practicable.'"

*Id.* Ultimately, an ambiguous contract is a question of fact that must be submitted to a factfinder. *Id.* at 454.

### a. 19200 Glendale's Alleged Breach of Contract

Cheetah Miner alleges 19200 Glendale "modified the Premises although not permitted to do so under Section 2(A) of the Lease." (ECF No. 49, PageID.1773 ¶ 47.) However, Cheetah Miner provides no analysis of the language of the Lease to support a finding that Section 2(A) required 19200 Glendale to supply electricity.[4] As was the case when Cheetah Miner moved for a preliminary injunction, it "fails to direct the Court to the relevant portion of Section 2(A) of the Lease that Defendant allegedly breached." (ECF No. 17, PageID.376 (Order Denying Plaintiff's Motion for Preliminary Injunction)).

Reading the plain language of Section 2(A), the Court finds no language obligating 19200 Glendale to provide electricity or maintain the Property in any particular condition. Cheetah Miner relies on the fact that the Property was leased "as is." (ECF No. 49, PageID.1770; ECF No. 62, PageID.2338.) However, it provides no argument, authority, or explanation to support a finding that because the Property was rented "as is," 19200 Glendale was prohibited from subsequently altering the Property or required to permit Cheetah Miner to alter the property.

---

[4] Although not raised by the parties, the Lease provides that it was "the result of negotiations between the parties, and in construing any ambiguity hereunder no presumption shall be made in favor of either party." (ECF No. 60-3, PageID.2228.)

Cheetah Miner's argument is further undermined by the text of Section 2(A) and the Lease as a whole.

Section 2(A) states that "[t]enant waives any implied warranty that the Premises or Project are suitable for Tenant's intended purposes." (ECF No. 60-3, PageID.2209.) It goes on to state that "[i]n no event shall Landlord have any obligation to Tenant for any defects in the Premises or any limitation on its use." (*Id.*) Nothing in the language of Section 2(A) suggests that 19200 Glendale was unable to modify the Property or that the Property was suitable for Bitcoin mining. To the contrary, it explicitly provides that 19200 Glendale was able to "install, maintain, use, repair and replace pipes, ducts, conduits, wires and structural elements leading through" the Property and "make alterations or additions to" the Property. (*Id.*)

Section 10(d) of the Lease also supports this reading. This section states that the "[l]andlord shall not be liable for . . . any failure to furnish any services or utilities described herein for any reason[.]" (ECF No. 60-3, PageID.2217.) Although Cheetah Miner argues that this section only applies to third-party actions, the repeated use of the inclusive term "any" belies that argument. *McCormack v. McCormack*, No. 315624, 2014 WL 2118294 at *2 (Mich. Ct. App. May 20, 2014); *United States v. Sammons*, 55 F.4th 1062, 1067 (6th Cir. 2022) (finding that in the context of statutory interpretation, when "[r]ead naturally, the word 'any' has an

17

expansive meaning, that is, 'one or some indiscriminately of whatever kind.'").

This section suggests that the parties contemplated changes in the availability of

electrical service and that Cheetah Miner would not be liable for any interruption

of that service. As the language of the Lease is unambiguous that there was no

obligation under the Lease to maintain the Property in any particular condition, a

change to the available electricity did not constitute a breach.

As for Cheetah Miner's argument that *Bryant v. Willison Real Est. Co.*, 350

S.E.2d 748, 752 (W. Va. 1986) requires an alternative result, *Bryant* is not on point

as it stands for the general proposition that in a contract for the sale of real estate,

an "as is" clause means the "purchaser must take the premises covered in the real

estate sales contract in its present condition as of the date of the contract." This

says nothing about a landlord's duty to maintain a rental premises in the same

condition as the date of occupancy in the case of a lease with a similar provision.[5]

Additionally, *Bryant* is a case from West Virginia, which has little bearing on

Michigan contract law.[6] For the foregoing reasons, 19200 Glendale's motion for

---

[5] The Court further notes that although it makes references to the covenant of quiet enjoyment, Cheetah Miner has not pleaded a claim for the breach of the implied covenant of quiet enjoyment, but instead it bases its claim on the explicit language of Section 2(A).

[6] The only Michigan case cited by *Bryant* is *Lenawee Cnty. Bd. of Health v. Messerly*, 331 N.W.2d 203, 211 (Mich. 1982), which involved the equitable remedy of recission and the application of an "as is" clause to defects unknown at the time a contract was executed. Like *Bryant*, it did not involve a change to the condition of a rental property after the execution of a lease.

summary judgment is **GRANTED** as to Cheetah Miner's Count II.  Cheetah

Miner's motion for summary judgement is **DENIED** as to Count II.

### b.  Cheetah Miner 's Alleged Breach of Contract

19200 Glendale claims that Cheetah Miner has "failed to pay building

operating expenses and taxes, has failed to pay its share of the DTE Energy costs,

and has failed to install a sub-meter or separate meter to track its electrical use

within a reasonable time" and that such failures constitute breaches of the Lease.

(ECF No. 52, PageID.1911.)

### i.  Sub-meter

19200 Glendale argues that the following provision of the Lease obligated

Cheetah Miner to install a separate electrical submeter, while Cheetah Miner

argues that the Lease merely required it to install such a meter if it installed a

separate meter:

> All utilities with separate meters shall be paid for by Tenant directly to the applicable service provider. Tenant shall install a sub-meter to the Premises to track its electrical usage prior to the installation of any separate meter. Tenant will be solely responsible for the cost of any separate or sub metering and will be solely responsible for the utility costs attributable to its use.

(ECF No. 60-3, PageID.2214-2215.)  In contrast, when it comes to

telecommunications systems, the Lease clearly states that "[t]enant, at its cost and

for its own account, shall be solely responsible for obtaining and installing all

telecommunications systems[.]" (*Id.* at PageID.2214-2215.)

Based on the plain language of the Lease, and comparison of the telecommunications clause with the clause regarding the sub-meter, the Court finds that it is unambiguous that Cheetah Miner had no obligation to install a sub-meter unless it installed a separate meter.  Specifically, the Lease states that Cheetah Miner "shall install a sub-meter to the Premises to track its electrical usage ***prior to*** the installation of any separate meter."  (*Id.* at PageID.2214-2215 (emphasis added).)  There is no explicit obligation for Cheetah Miner to install such a separate meter, and this reading is bolstered by the fact that the telecommunications provision specifically provides that Cheetah Miner "at its cost and for its own account, shall be solely responsible for ***obtaining*** and ***installing*** all telecommunications systems."  (*Id.* (emphasis added).)  Such specific language was not used in relation to the submeter, which bolsters the conclusion that the requirement was conditioned on the initial installation of a separate meter.

For the foregoing reasons, Cheetah Miner did not breach the Lease by failing to install a sub-meter or separate meter.  Consequently, Cheetah Miner's motion for summary judgment is **GRANTED** as to the breach of contract claim based on the sub-meter clause. 19200 Glendale's motion for summary judgment is **DENIED** as to the breach of contract claim based on the sub-meter clause.  In summary, under the plain language of the Lease, 19200 Glendale had no obligation to provide

electricity, and Cheetah Miner had no obligation to install a submeter, but was required to do so if it installed a separate meter to obtain electricity.

### ii.  Failure to Pay Charges Under the Lease

As there is no specific evidence of late rental payments prior to December 2022, and 19200 Glendale continued to accept the late payments, they would not constitute a substantial breach even if proven.  *Park Forest of Blackman v. Smith*, 316 N.W.2d 442, 445–446 (Mich. Ct. App. 1982).  Furthermore, there has been insufficient evidence presented to support a finding that 19200 Glendale provided notice to Cheetah Miner regarding late payments or that Cheetah Miner failed to cure as set forth in the Lease.  As 19200 Glendale has not provided sufficient evidence to generate a genuine dispute of material fact as to rental payments which would have constituted a breach of the Lease prior to December 2022, the Court **GRANTS** Cheetah Miner's motion for summary judgment as to the breach of contract claim as it relates to any rental payments made prior to December 2022.

However, rent from December 2022 forward is a different story.  It is uncontested that this rent was not paid, and it appears Cheetah Miner was given written notice that it was in default due to failure to pay rent by at least April 19, 2023, when 19200 Glendale filed its response to the motion for temporary restraining order and subsequent counterclaim.  (ECF Nos. 6, 20.)  However, no demand for rent was made at the time Cheetah Miner ceased payments.  (ECF No.

21

62, PageID.2341.)  As there is a genuine dispute of material fact as to the demand for rent and there is an outstanding question of 19200 Glendale's liability under the Anti-Lockout Statute, which will be discussed below, both motions for summary judgment are **DENIED** as it relates to rental payments after December 2022.

Likewise, under the plain language of the Lease, Cheetah Miner was obligated to pay common area expenses, and it is uncontested that it has not done so since April 2022.  However, there is a genuine issue of material fact as to if 19200 Glendale provided notice of this failure or an opportunity to cure as required under Section 21(a)(i) of the Lease.  (ECF No. 60-3, PageID.2221.)  For those reasons, Cheetah Miner's motion for summary judgment is **DENIED** as to the breach of contract claim for failure to pay common area expenses.  19200 Glendale's motion for summary judgment is likewise **DENIED** as to the breach of contract claim for failure to pay common area expenses as there remains a genuine issue of material fact.

Finally, under the plain language of the Lease, Cheetah Miner was obligated to pay for electricity.  As there remains a factual dispute as to the timing and amount owed to DTE, in addition to notice and opportunity to cure, both motions for summary judgment are **DENIED** as to the contract claim as it relates to utility payments.

## A. Anti-Lockout Statute, Mich. Comp. Laws § 600.2918(2)(f)

Cheetah Miner maintains that by changing the electrical service for the Property, 19200 Glendale violated the Michigan Anti-Lockout Statute, Mich. Comp. Laws § 600.2918(2)(f).  The Michigan Anti-Lockout statue provides, in relevant part, the following:

> 2) Any tenant in possession of premises whose possessory interest has been unlawfully interfered with by the owner is entitled to recover the amount of his or her actual damages or $200.00, whichever is greater, for each occurrence and, if possession has been lost, to recover possession. Subject to subsection (3), unlawful interference with a possessory interest includes 1 or more of the following:
>
> ****
>
> (f) Causing, by action or omission, the termination or interruption of a service procured by the tenant or that the landlord is under an existing duty to furnish, which service is so essential that its termination or interruption would constitute constructive eviction, including heat, running water, hot water, electric, or gas service.

Mich. Comp. Laws § 600.2918(2)(f).

Preliminarily, it is uncontested that Cheetah Miner is a tenant, and 19200 Glendale qualifies as an owner for the purposes of the Anti-Lockout Statute.  It is also clear that the electrical service was "interrupted" when it was shut off. Finally, electricity is one of the specifically enumerated services that, if interrupted, constitutes a violation of the statute.  19200 Glendale argues that to succeed in a claim under this section of the Anti-Lockout statute, a plaintiff must satisfy all the elements of a constructive eviction claim, including vacating the premises.

23

### a. Constructive Eviction

The Court affirms its prior finding in the Order Denying Plaintiff's Motion for Preliminary Injunction (ECF No. 17) that under Michigan law, constructive eviction requires that the tenant vacate the premises. *See Karpp v. Royer*, 106 N.W.2d 244, 246 (Mich. 1960); *Wickins v. Lyon Marine, Ltd.*, No. 176355, 1997 WL 33353736 at *1 (Mich. Ct. App. Apr. 1, 1997); *Panagos v. Fox*, 16 N.W.2d 700, 702 (Mich. 1944). However, the Court notes that the prior order only addressed Cheetah Miner's argument that it was ***in fact*** constructively evicted. (*See* ECF No. 2, PageID.91 ("A constructive eviction occurs when there is a disturbance of the tenant's possession by the landlord, the premises are rendered unfit for occupancy . . . . That is exactly what happened here." ).) At the preliminary injunction stage, the parties did not distinguish between a claim under Mich. Comp. Laws. § 600.2918(2)(f), the argument which is now raised. (ECF No. 17, PageID.374.) For that reason, the Court's prior order is not dispositive as the parties have raised new arguments at this stage that involve questions of statutory interpretation that were not previously addressed.

None of the cases cited by 19200 Glendale are directly on point as they do not discuss whether a tenant must vacate in order to recover under the Anti-Lockout Statute. *See generally Briarwood v. Faber's Fabrics, Inc.*, 415 N.W.2d 310 (Mich. Ct. App. 1987) (refusal to extend lease did not constitute constructive

eviction); *Nelson v. Grays*, 531 N.W.2d 826 (Mich. Ct. App. 1995) (question not reached as it was undisputed that tenant vacated the premises); *Equitable Life Ins. Soc. of U.S. v. Elias Bros. Rest.*, No. 203631, 1998 WL 1988576 (Mich. Ct. App. Dec. 18, 1998) (plaintiff only brought claim for constructive eviction and it was undisputed that tenant vacated); *Everson v. Albert*, 246 N.W. 88 (Mich. 1933) (same).

> When construing statutory language, the court must read the statute as a whole and in its grammatical context, giving each and every word its plain and ordinary meaning unless otherwise defined. Effect must be given to every word, phrase, and clause in a statute, and the court must avoid a construction that would render part of the statute surplusage or nugatory. If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is permitted.

*Book-Gilbert v. Greenleaf*, 840 N.W.2d 743, 745-746 (Mich. Ct. App. 2013) (internal citations and quotations omitted). Further, "[w]hen terms are not expressly defined by statute, a court may consult dictionary definitions." *People v. Thomas*, 687 N.W.2d 598, 600 (Mich. Ct. App. 2004).

The analysis starts with an analysis of the language "[a]ny tenant in possession of premises." As 19200 Glendale acknowledges, "[o]n its face, subsection (2) applies to both tenants in possession and tenants who have lost possession of the premises." (ECF No. 60, PageID.2135.) However, it argues that because there are other ways in which a tenant's interest may be interfered with under the statute and, subdivision (f) must be limited to tenants who have satisfied

the requirements of constructive eviction.  Cheetah Miner argues that the inclusion of the language "would constitute constructive eviction" is instead a shorthand to guide courts in determining what other services would be so essential as to constitute a violation of the statute.   (ECF No. 62, PageID.2353.)  On this point, the Court finds Cheetah Miner's argument most persuasive. Under a plain reading of the language of the statute, a party need not meet the elements of constructive eviction to recover under § 600.2918(2)(f).

The word "any" is generally read broadly. *See Sammons*, 55 F.4th at 1067. Furthermore, the legislature inserted the words "in possession of premises" and there is no limiting language in § 600.2918(2)(f) which would suggest that the language of subsection (2) did not apply.  This reading is bolstered by the language "***would*** constitute constructive eviction[.]"  The use of the word "would" suggests that the tenant in possession need not necessarily have a claim for constructive eviction; the service was merely essential enough that it would otherwise support such a claim.

Further, the Court is not convinced that merely because some of the means of interference listed under the statute may imply the loss of possession, like the changing of locks, implies that some subdivisions only apply to tenants who have vacated the premises.  This reading conflicts with the broad language of Section (2).  The Court also finds that Cheetah Miner's interpretation would not render the

26

phrase in the provision that "if possession has been lost, [the tenant may] recover possession" meaningless. (*See* ECF No. 60, PageID.2135.) On the contrary, Cheetah Miner's interpretation gives full effect to all provisions of the statute which, according to its plain language, applies to both tenants in possession and those who have lost possession.

Reading the term "constructive eviction" according to its traditional meaning under the common law, there is still no language in subdivision (f) which suggests that a tenant must meet those requirements. For example, the legislature did not say "a tenant who is constructively evicted has a claim under this section." Instead, it included the phrase "would constitute constructive eviction" in addition to a list of examples. Consequently, the Court finds that the statute unambiguously allows a tenant in possession to recover under § 600.2918(2)(f).

### b. "Existing Duty to Furnish" or "Procured" by Tenant

Although not raised by the parties, the Court finds that it is a closer question as to if 19200 Glendale had "an existing duty to furnish" the electrical service or if it was "procured" by Cheetah Miner within the meaning of the statute. As previously discussed, 19200 Glendale was not under "an existing duty to furnish" electricity because it had no contractual obligation to do so and Cheetah Miner has cited to no authority supporting the proposition that it had a general obligation to provide electricity, other than via the Lease. *See supra* Section III.A.a. The

remaining question is if Cheetah Miner "procured" the electricity service under the meaning of the statute by contracting with DTE and retrofitting the Property such that electricity would be brought to the room where the Bitcoin mining locations were operated.  (ECF No. 65-2, PageID.2685.)

"Procure" is defined as "[t]o obtain (something), esp. by special effort or means." *Procure*, Black's Law Dictionary (12th ed. 2024).  Consequently, the Court finds that Cheetah Miner likely "procured" the electrical service as contemplated under the statute when it arranged for 19200 Glendale's electricians to retrofit the Building to direct power to the mining space.  However, this is complicated by the fact that it is unclear whether Cheetah Miner had a legal right to the electricity it was using.

As this argument was not addressed by the parties and appears to be an issue of first impression, both motions for summary judgment are **HELD IN ABEYANCE** as to Count I of the complaint as to 19200 Glendale for the reasons outlined above.  **IT IS FURTHER ORDERED** that the parties **SHALL FILE** supplemental briefing on Count I by September 29, 2025.  The motions should specifically address the issue of "procurement" under the Anti-Lockout Statute and any potential defenses.

**B. Personal Liability of Caradonna**

Contrary to 19200 Glendale's arguments, individual tort liability for a corporate officer is not limited to alter ego or piercing the corporate veil. It may also be imposed where a corporate officer actually participated in the commission of a tort, as is alleged here. The Court addressed this argument in its prior Order granting leave to amend the complaint. (ECF No. 45.) That prior reasoning is still applicable and is as follows. First, eviction under the Anti-Lockout Statute gives rise to a claim in tort. *See Elia Companies, LLC v. Univ. of Mich. Regents*, 966 N.W.2d 755, 764 (Mich. Ct. App. 2021), *rev'd on other grounds*, 993 N.W.2d 392 (2023). Second, "[i]t is well established that a corporate officer or agent is personally liable for torts committed by him even though he was acting for the benefit of the corporation." *In re Interstate Agency, Inc*., 760 F.2d 121, 125 (6th Cir. 1985) (emphasis in original) (alteration added) (interpreting Michigan law).

However, the Anti-Lockout Statute only applies to "owners." Under Mich. Comp. Laws § 600.2918(9), "owner" is defined as "the owner, lessor, or licensor or an agent of the owner, lessor, or licensor." Caradonna is a manager of 19200 Glendale, and a manager is an agent of the limited liability company for the purpose of its business. (ECF No. 60-11, PageID.2282); Mich. Comp. Laws § 450.4406; *Tanger Grand Rapids, LLC v. Rockford Constr. Co*., No. 23-1349, 2024 WL 1049450, at *1 n.2 (6th Cir. Mar. 11, 2024). As 19200 Glendale is the lessor of

29

the property and Caradonna is its agent, he may be held liable for his personal actions under the Anti-Lockout Statute. The Lease provision exempting managers from personal liability does not apply as that provision was limited to contract liability arising under the Lease. (*See* ECF No. 65, PageID.2655.)

Finally, the Court finds that Cheetah Miner has provided sufficient evidence to generate a genuine dispute of material fact that Caradonna individually participated in a violation of Mich. Comp. Laws § 600.2918(2)(f). Specifically, the emails between Tan and Caradonna suggest that Caradonna controlled the power. (ECF No. 62-23; *see also* ECF No. 62-24, PageID.2584.) However, 19200 Glendale has provided Caradonna's deposition in which he states that he did not know how the power was switched over or who was responsible. (ECF No. 60-11, PageID.2292, 2302, 2316.) In addition to the issue of statutory interpretation discussed above, there is a genuine dispute of material fact as to Caradonna's participation in the power shutoff decision. Consequently, both motions for summary judgment are **DENIED** as to Caradonna individually as there is a genuine issue of material fact.

## IV.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the parties' cross motions for summary judgment are **GRANTED IN PART AND DENIED IN PART**

30

except to the extent the motions are **HELD IN ABEYANCE** as to Count I of Cheetah Miner's complaint as outlined below.

Both motions for summary judgment are **HELD IN ABEYANCE** as to Count I of the complaint as to 19200 Glendale for the reasons outlined above.  **IT IS FURTHER ORDERED** that the parties **SHALL FILE** supplemental briefing on Count I by **September 29, 2025**.  The motions should specifically address the issue of "procurement" under the Anti-Lockout Statute and any potential defenses.

**IT IS FURTHER ORDERED** that both motions for summary judgment are **DENIED** as to Caradonna individually as there remain genuine issues of material fact.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (ECF No. 60) is **GRANTED** as to Count II of the complaint and Plaintiff's motion for summary judgment (ECF No. 63) is **DENIED** as to Count II. **IT IS FURTHER ORDERED** that Count II of the complaint is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment is **GRANTED IN PART** and 19200 Glendale's motion for summary judgment is **DENIED IN PART** as to Count I and II of the counterclaim for claims arising under: (1) nonpayment or late payment of rent prior to December 2022 and (2) failure to install submeter or separate meter.  **IT IS FURTHER ORDERED**

31

that Counts I and II of the counterclaim are **DISMISSED IN PART** as to breach

based on late payment of rent prior to December 2022 and the meter issue.

 **IT IS FURTHER ORDERED** that both motions for summary judgment are

**DENIED** as to Count I and II of the counterclaim for claims arising under failure

to pay rent, operating expenses, and utilities as there remain genuine disputes of

material fact.

s/ Linda V. Parker_____
LINDA  V. PARKER
U.S. DISTRICT JUDGE

 Dated: September 8, 2025